**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
EASTERN DIVISION**

**KIMBERLY A. BRUCTO,**

   **Plaintiff,**

 v.            Civil Action 2:20-cv-3157
              Judge Algenon Marbley
              Magistrate Judge Kimberly A. Jolson

**COMMISSIONER OF
SOCIAL SECURITY,**

   **Defendant.**

## REPORT AND RECOMMENDATION

Plaintiff, Kimberly A. Bructo, brings this action under 42 U.S.C. § 405(g) seeking review of a final decision of the Commissioner of Social Security ("Commissioner") denying her application for Disability Insurance Benefits ("DIB"). It is **RECOMMENDED** that the Court **OVERRULE** Plaintiff's Statement of Errors and **AFFIRM** the Commissioner's decision.

**I. BACKGROUND**

Plaintiff protectively filed her application for DIB on December 30, 2016, alleging that she was disabled beginning July 1, 2016, due to type II diabetes, neuropathy, hallus virus, degenerative disc disease, and cardiac arrhythmia. (Tr. 179–80, 199). After her application was denied initially and on reconsideration, the Administrative Law Judge (the "ALJ") held a hearing on January 7, 2019. (Tr. 29–68). The ALJ denied benefits in a written decision (Tr. 12–28). That became the final decision of the Commissioner when the Appeals Council denied review. (Tr. 1–6).

Plaintiff filed the instant case seeking a review of the Commissioner's decision on June 22, 2020. (Doc. 1). The Commissioner filed the administrative record on November 2, 2020 (Doc. 12); Plaintiff filed her Statement of Errors (Doc. 17) on January 22, 2021; and Defendant filed an

Opposition (Doc. 19) on March 8, 2021. Plaintiff did not file a Reply. Thus, this matter is now ripe for consideration.

### A. Relevant Hearing Testimony

The ALJ summarized the testimony from Plaintiff's hearing as follows:

> The [Plaintiff] testified that she has diabetes with ulcers on her feet. She complained of numbness in the feet, alleging that she has to wear diabetic socks. She also reported that she has a plate and screws in the right foot. She stated that she uses a knee scooter when she walks, although she admitted that it was not prescribed by a doctor. The [Plaintiff] asserted that she stopped working because of a nonhealing ulcer, and that the great toe on her right foot might have to be amputated. She further indicated having a back injury from work, which resulted in a laminectomy. She additionally mentioned that she gets bloating in her abdomen and that she will be evaluated for gastroparesis.

(Tr. 18–19).

### B. Relevant Medical Evidence

The ALJ summarized the relevant medical records:

> [ ] She had a history of surgery to resect a sesamoid bone in her right foot with a sore on her right great toe, and magnetic resonance imaging (MRI) of the foot in July 2016 described skin irregularities and mild marrow edema corresponding with a soft tissue injury. Cellulitis or osteomyelitis was not appreciated, however (Exhibit 7F). On examination, there was a dry, callused lesion on the right great toe, but sensation was impaired in both feet (Exhibit 4F). An electromyogram (EMG) in October 2016 uncovered a predominantly axonal sensorimotor polyneuropathy bilaterally. A[n] MRI of the left foot in November 2016 indicated a nondisplaced stress or insufficiency fracture involving the metatarsal head of the second toe. The [Plaintiff] followed up with a plantar plate repair and peri-interphalangeal fusion of the second metatarsal head in December 2016 (Exhibits 6F, 7F).
>
> As of February 2017, the [Plaintiff]'s left foot was doing well and the surgical incisions were healed. Venous Doppler studies of the left lower extremity were negative for any deep venous thrombosis (Exhibits 7F, 17F). She was even physically active at her three-acre home and taking care of horses (Exhibit 6F). In her right foot, there was good mobility of the great toe, but also a hallux varus deformity with diminished sensation. She underwent arthrodesis of the right first metatarsal phalangeal joint in March 2017. Afterwards, she wore diabetic shoes to decrease the pressure on her feet. Bone density studies of the lumbar spine and left hip at the time were within normal limits (Exhibits 8F, 9F).

(Tr. 19).

> In July 2017, more surgery was performed on the [Plaintiff]'s feet, including a repair of a nonunion of the first metatarsal phalangeal joint, and a tendon transfer procedure on the left to correct a hammertoe deformity (Exhibit 13F). She returned to the hospital in October 2017 alleging increasing pain and swelling in both legs, but she was noted to ambulate without any difficulty. Her pulses were intact, and she had no erythema and only 1+ pitting edema. Doppler studies remained negative for deep venous thrombosis in either limb (Exhibit 17F). Pursuant to a January 2018 office note, the [Plaintiff] had healing ulcers on the second metatarsal of the right foot, and the fifth metatarsal heads bilaterally. Treatment consisted of antibiotics, gauze dressings, and diabetic shoes. Additional imaging of her feet in March 2018 demonstrated that the fusions had healed, and that all of the implants were in good position (Exhibit 15F).

(Tr. 19–20).

> Another EMG of the [Plaintiff]'s legs in December 2018 comported with a marked peripheral neuropathy, worse on the left side. Clinically, she had a macerated right great toe and a gait abnormality, but her lower extremities pulses were all palpable, with good range of motion and motor strength throughout. She was even advised to exercise (Exhibits 18F, 20F, 22F).
>
> [ ] Objective imaging revealed that her toe fusions healed satisfactorily, and that all of the hardware was in good position (Exhibit 15F) Venous Doppler testing on two occasions failed to show deep venous thrombosis affecting her lower extremities (Exhibit 17F). The [Plaintiff] has peripheral neuropathy in both distal lower limbs with sensory deficits, the result of diabetes and surgery, but she retained good pulses, strength, and movement in her legs and feet. The file notes that she lives on three acres, takes care of horses, and walks a friend's dog, all of which indicates that her lower extremities have some functional use. According to her function report, she also does a limited amount of laundry, cleaning, meal preparation, and driving (Exhibit 3E). The record documents that the [Plaintiff]'s back surgery is by history, and furthermore, a medically determinable mental or abdominal diagnosis has not been established. [ ]

(Tr. 20).

### C. The ALJ's Decision

The ALJ found that Plaintiff meets the insured status requirement through December 31, 2021 and has not engaged in substantial gainful activity since July 1, 2016, her alleged onset date of disability. (Tr. 17–18). The ALJ determined that Plaintiff has the following severe

3

impairments: degenerative disc disease; diabetes mellitus with peripheral neuropathy; and bilateral foot disorders. (Tr. 18). The ALJ, however, found that none of Plaintiff's impairments, either singly or in combination, meets or medically equals a listed impairment. (*Id.*).

As to Plaintiff's residual functional capacity ("RFC"), the ALJ opined:

> After careful consideration of the entire record, [the ALJ] finds that the [Plaintiff] has the residual functional capacity to perform sedentary work as defined in 20 CFR 404.1567(a) with occasional climbing of stairs, crouching, crawling, kneeling, and stooping/bending; avoiding workplace hazards such as dangerous, moving machinery and unprotected heights; no climbing of ladders, ropes, or scaffolds; occasional foot controls with the bilateral lower extremities.

(*Id.*).

Upon "careful consideration of the evidence," the ALJ found that Plaintiff's "statements concerning the intensity, persistence and limiting effects of [her] symptoms are not entirely consistent with the medical evidence." (Tr. 19).

Relying on the vocational expert's testimony, the ALJ concluded that Plaintiff was unable to perform her past relevant work as a nurse, but she has acquired work skills from her past relevant work and she could make a successful adjustment to perform other jobs in the national economy such as a consulting nurse, medical technician or cardiovascular technician. (Tr. 21–22). She therefore concluded that Plaintiff has not been disabled within the meaning of the Social Security Act, since July 1, 2016. (Tr. 22).

## II. STANDARD OF REVIEW

The Court's review "is limited to determining whether the Commissioner's decision is supported by substantial evidence and was made pursuant to proper legal standards." *Winn v. Comm'r of Soc. Sec.*, 615 F. App'x 315, 320 (6th Cir. 2015); *see also* 42 U.S.C. § 405(g). "[S]ubstantial evidence is defined as 'more than a scintilla of evidence but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to

support a conclusion.'" *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007) (quoting *Cutlip v. Sec'y of HHS*, 25 F.3d 284, 286 (6th Cir. 1994)).

"After the Appeals Council reviews the ALJ's decision, the determination of the council becomes the final decision of the Secretary and is subject to review by this Court." *Olive v. Comm'r of Soc. Sec.*, No. 3:06 CV 1597, 2007 WL 5403416, at *2 (N.D. Ohio Sept. 19, 2007) (citing *Abbott v. Sullivan*, 905 F.2d 918, 922 (6th Cir. 1990); *Mullen v. Bowen*, 800 F.2d 535, 538 (6th Cir. 1986) (*en banc*)). If the Commissioner's decision is supported by substantial evidence, it must be affirmed, "even if a reviewing court would decide the matter differently." *Id.* (citing 42 U.S.C. § 405(g); *Kinsella v. Schweiker*, 708 F.2d 1058, 1059–60 (6th Cir. 1983)).

### III. DISCUSSION

Plaintiff argues that the ALJ improperly evaluated the opinion of her treating podiatrist, Dr. Jacqueline Donovan. Plaintiff divided her arguments into two subparts contending first that the ALJ did not follow the controlling weight test and then arguing that the ALJ failed to give good reasons for the weight she assigned Dr. Donovan's opinion. (Doc. 17). The Commissioner responds that there was no error, and even if there was, it was harmless.

**A. Treating Physician Rule**

Two related rules govern how the ALJ was required to analyze a treating physician's opinion: the treating physician rule and the good reasons rule. *Dixon v. Comm'r of Soc. Sec.*, No. 14-478, 2016 WL 860695, at *4 (S.D. Ohio Mar. 7, 2016). The treating physician rule requires an ALJ to give controlling weight to a treating source's opinion on the issue(s) of the nature and severity of the claimant's impairment(s) if the opinion is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in the case record." *LaRiccia v. Comm'r of Soc. Sec.*, 549 F. App'x 377, 384 (6th Cir.

2013) (quoting 20 C.F.R. § 404.1527(c)(2)) (internal quotation marks omitted).  The good reasons rule requires the ALJ to always give "good reasons . . . for the weight given to the claimant's treating source opinion."  *Dixon*, 2016 WL 860695, at *4 (quoting *Blakely*, 581 F.3d at 406 (alterations in original)); 20 C.F.R. § 404.1527(c)(2).  At base, ALJ's determination "must be sufficiently specific to make clear to any subsequent reviewers the weight the adjudicator gave to the treating source's medical opinion and the reasons for the weight."  *Cole v. Astrue*, 661 F.3d 931, 937 (6th Cir. 2011).  Paramount is whether ". . . the ALJ's opinion permits the claimant and a reviewing court a clear understanding of the reasons for the weight given a treating physician's opinion."  *Friend v. Comm'r of Soc. Sec.*, 375 F. App'x 543, 551 (6th Cir. 2010).  Reading the decision as a whole, the ALJ has provided such a clear understanding here.

Roughly six weeks after first meeting Plaintiff, in September 2018, Dr. Donovan completed a Physical Medical Assessment checkbox form regarding Plaintiff's physical abilities.  (Tr. 891–94).  In most categories, she found Plaintiff severely limited.  She opined, *inter alia*, that Plaintiff could sit for less than 2 hours; could stand for less than 2 hours; could not lift or carry less than 10 pounds; could not perform postural movements; required an assistive device; would be off task 25 % or more; and would miss work 20 days per month.  (*Id.*).  There is only one narrative portion of the opinion; it states, "pain with ambulation, continued neuropathy and continued ulceration with extended periods of standing/walking."  (Tr. 891).

Ultimately, the ALJ did not give great weight to Dr. Donovan's opinion:

> J. Donovan, M.D., the [Plaintiff]'s treating podiatrist, reported in July 2018 that she had continued neuropathy and ulceration with extended periods of standing or walking. The doctor believed that she would not be able to sit, stand, or walk for even 2 hours out of an 8-hour workday, and that all ambulation had to be done with an assistive device. Dr. Donovan further opined that she would miss 20 days of work a month as a result of her condition (Exhibit 16F). The undersigned does not give great weight to this doctor's determination of disability because the record

6

> reveals that the ulcers on the [Plaintiff]'s feet were healing and that the surgery on her toes had a good result.

(Tr. 20).

It appears that Plaintiff wants the Court to stop reading there and determine that the ALJ did not explain thoroughly enough why Dr. Donovan's extreme limitations were not adopted. (Doc. Doc. 17 at 13). But the next three paragraphs provide several reasons why the ALJ did not give controlling weight to Dr. Donovan's opinion. In the very next paragraph, the ALJ noted that a December 2018 EMG of Plaintiff's legs revealed impairments, but Plaintiff had palpable lower extremity pulses with good range of motion and motor strength throughout. (*See* Tr. 20, 959–80, 991–1012, 1106–09). The ALJ also expressly noted that Plaintiff was advised to exercise. (Tr. 20).

Then, in the following paragraph, the ALJ further described why Plaintiff would not be precluded from sedentary work. (*See id.*, ("[Plaintiff's] use of diabetic shoe and knee scooter would not prevent seated duties.")). The ALJ came to this conclusion because "[o]bjective imaging revealed that [Plaintiff's] toe fusions healed satisfactorily[,] . . . all of the hardware was in good position[,] . . . [and] . . . Venous Doppler testing on two occasions failed to show deep venous thrombosis affecting her lower extremities." (*Id.*) Further, despite peripheral neuropathy in both distal lower limbs with sensory deficits, the ALJ explained that records showed that Plaintiff "retained good pulses, strength, and movement in her legs and feet." (*Id.*) Ultimately, the ALJ concluded that the record did not have "enough of a clinical or objective basis to preclude all sedentary employment." (*Id.*; *see also* 20 C.F.R. § 404.1527(c)(4) ("*Consistency.* Generally, the more consistent a medical opinion is with the record as a whole, the more weight we will give to that medical opinion.")).

The ALJ also described what Plaintiff does in her daily life: "The file notes that she lives on three acres, takes care of horses, and walks a friend's dog, all of which indicates that her lower extremities have some functional use. According to her function report, she also does a limited amount of laundry, cleaning, meal preparation, and driving (Exhibit 3E)." (Tr. 20). The ALJ also considered the assessments from state agency physicians Drs. Hall and Bolz, who opined that Plaintiff could not perform her past work as a nurse but could perform sedentary work. (Tr. 69–86, 88–101). The ALJ gave these opinions some weight and, considering the subsequent evidence and Plaintiff's allegations, formulated a more restricted sedentary residual functional capacity. (Tr. 20).

Thus, read as a whole, the ALJ provided good reasons for not affording Dr. Donovan's opinion controlling weight. *See Dutkiewicz v. Comm'r of Soc. Sec.*, 663 F. App'x 430, 432 (6th Cir. 2016); *Nelson v. Comm'r of Soc. Sec.*, 195 F. App'x 462, 470–71 (6th Cir. 2006). Indeed, the Sixth Circuit has said that an ALJ "may accomplish the goals [of the treating physician rule] by indirectly attacking the supportability of the treating physician's opinion or its consistency with other evidence of record." *Coldiron v. Comm'r of Soc. Sec.*, 391 F. App'x 435, 440–441 (6th Cir. 2010). Most importantly, the ALJ's decision is understandable, and it is clear why she did not afford controlling weight to Dr. Donovan's opinion. *Friend*, 375 F. App'x at 551 (noting that the "paramount" concern is for a claimant to understand why she did not receive benefits).

**B. Harmless Error**

The Commissioner additionally argues that if there was a procedural violation here, the error was harmless. A violation of the procedural requirement can be deemed "harmless error" if one of the following requirements is satisfied: (1) a treating source's opinion is so patently deficient that the Commissioner could not possibly credit it; (2) if the Commissioner adopts the

opinion of the treating source or makes findings consistent with the opinion; or (3) where the Commissioner has met the goal of § 1527(d)(2) … even though []he has not complied with the terms of the regulation. *Cole v. Astrue*, 661 F.3d 931, 940 (6th Cir. 2011) (citations and quotes omitted).

The Commissioner views Dr. Donovan's opinion as so "patently deficient" that the ALJ could not credit it. The Sixth Circuit has explained that "an ALJ may properly discount a treating physician's opinion when the opinion is in the form of a conclusory checkbox questionnaire[.]" *See Rice v. Comm'r of Soc. Sec.*, 19-3497, 2020 WL 1041446, *6 (6th Cir. 2020) (citing *Ellars v. Comm'r of Soc. Sec.*, 647 F. App'x 563, 566 (6th Cir. 2016) (providing that the ALJ properly afforded little weight to a treating physician's two-page check-off form that did not cite to objective medical evidence)). Although the Undersigned finds some merit in the Commissioner's argument, resolution of the issue is not needed because the ALJ did not err.

## IV. CONCLUSION

Based on the foregoing, it is **RECOMMENDED** that the Court **OVERRULE** Plaintiff's Statement of Errors and **AFFIRM** the Commissioner's decision.

## V. PROCEDURE ON OBJECTIONS

If any party objects to this Report and Recommendation, that party may, within fourteen (14) days of the date of this Report, file and serve on all parties written objections to those specific proposed finding or recommendations to which objection is made, together with supporting authority for the objection(s). A District Judge of this Court shall make a de novo determination of those portions of the Report or specific proposed findings or recommendations to which objection is made. Upon proper objection, a District Judge of this Court may accept, reject, or modify, in whole or in part, the findings or recommendations made herein, may receive further

evidence or may recommit this matter to the Magistrate Judge with instructions. 28 U.S.C. § 636(b)(1).

The parties are specifically advised that failure to object to the Report and Recommendation will result in a waiver of the right to have the district judge review the Report and Recommendation de novo, and also operates as a waiver of the right to appeal the decision of the District Court adopting the Report and Recommendation. *See Thomas v. Arn*, 474 U.S. 140 (1985); *United States v. Walters*, 638 F.2d 947 (6th Cir. 1981).

    IT IS SO ORDERED.


Date:  May 11, 2021                                  /s/ Kimberly A. Jolson
                                                            KIMBERLY A. JOLSON
                                                            UNITED STATES MAGISTRATE JUDGE